UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

| | |
|---|---|
| *In re* | Case Nos.:    03-81231-dte |
| | 03-82765-dte |
| TC LIQUIDATIONS LLC, *et al.*, | 03-84721-dte |
| | 03-84723-dte |
| Debtors. | 03-84722-dte |

(Substantively consolidated)

Chapter 7

---------------------------------------------------------------x
ROBERT L. PRYOR, Chapter 7 Trustee of the
bankruptcy estate of TC Liquidations, LLC, *et al.*,

                Adv. Pro. No.: 05-8682-dte

            Plaintiff,

             -against-

STEVE TIFFEN,

             Defendant.
---------------------------------------------------------------x
ROBERT L. PRYOR, Chapter 7 Trustee of the
bankruptcy estate of TC Liquidations, LLC, *et al.*,

                Adv. Pro. No.: 05-8683-dte

             Plaintiff,

           - against -

IRA TIFFEN,

             Defendant.
---------------------------------------------------------------x
ROBERT L. PRYOR, Chapter 7 Trustee of the
bankruptcy estate of TC Liquidations, LLC, *et al.*

                Adv. Pro. No.: 05-8684-dte

             Plaintiff,

            -against-

BARBARA MENDELSON,

Defendant.

-----------------------------------------------------------------x

ROBERT L. PRYOR, Chapter 7 Trustee of the
bankruptcy estate of TC Liquidations, LLC, *et al.*,

Adv. Pro. No.: 05-8685-dte

Plaintiff,

-against-

JEFFREY COHEN AND SANDRA COHEN,

Defendants.

-----------------------------------------------------------------x

## MEMORANDUM DECISION

*Appearances:*

Pryor & Mandelup, L.L.P.
*Attorneys for Plaintiff*
By: A. Scott Mandelup, Esq.
675 Old Country Road
Westbury, New York 11590

LaMonica Herbst & Maniscalco LLP
*Attorneys for Plaintiff*
By:  David A. Blansky, Esq.
3305 Jerusalem Avenue
Wantagh, NY 11793

Chadbourne & Parke LLP
*Attorneys for Defendants*
Scott S. Balber, Esq.
30 Rockefeller Plaza
New York, New York 10112

Ruskin Moscou Faltischek, P.C.
*Attorneys for Defendants*
By:  Michael Amato, Esq.
East Tower, 15th Floor
Uniondale, New York 11556-1425

The Honorable Dorothy Eisenberg, United States Bankruptcy Court

The Trustee of the Debtors' estates commenced the instant adversary proceedings against four insiders of the Debtors, and the Trustee seeks to recover certain transfers that the Debtors made to the Defendants between January 2001 and February 2003. These transfers during this time period included (a) two different sets of dividends that the Debtors issued to the Defendants, and (b) increases in certain of the Defendants' salaries while they were employed by the Debtors. The Trustee's relief is sought pursuant to 11 U.S.C. §§ 105(a), 544, 547(b), 548, 550, and 551; New York Debtor and Creditor Law ("DCL") §§ 273, 274, and 275; and a theory of unjust enrichment under New York common law.

The Debtors' estate is comprised of the following substantively consolidated corporate entities: (a) Tiffen Manufacturing Corp.; (b) The Tiffen Company, LLC; (c) Saunders Photo-Graphic, Inc.; (d) HTN Photo, Inc.; and (e) S.P. Acquisitions Corporation.

This Court has jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. § 1409. These are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (F), (H), and (O), and the following constitutes the Court's finding of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

<u>**BACKGROUND:**</u>

### 1. Ownership of Tiffen Manufacturing Corporation

Tiffen Manufacturing Corp. ("TMC"), the original company of the Debtors, manufactured, distributed and sold photographic supplies and equipment. The owners were Nathan and Helen Tiffen, the parents of Defendants Steven Tiffen, Ira Tiffen, Barbara Mendelson, and Sandra Cohen. In 1984 Nathan and Helen gifted 48% of their stock in TMC to their children.[1] They later retired and on April 24, 1991 they sold their remaining stock in TMC to their children Steven Tiffen, Ira Tiffen and Sandra Cohen for $1,832,000.00 plus interest (the

---

[1] At some time thereafter, Defendant Barbara Tiffen sold her stock back to her parents.

"TMC Sale"). The children agreed to pay the purchase price in 180 monthly installments of $20,535.76. The sale increased Steven Tiffen's stock interest in TMC to 51%, and Ira Tiffen's and Sandra Cohen's interest each increased to 24.5%.[2] Under the TMC Sale agreement Steven Tiffen paid his parents $13,032.04 per month, and both Ira Tiffen and Sandra Cohen each paid their parents $3,751.86 per month. After the TMC Sale, TMC started issuing monthly dividends to Steven, Ira and Sandra in sums that were approximately equal to their monthly obligations to their parents under the TMC Sale agreement, and they used these additional dividends to pay their parents (the Trustee is not seeking to recover these dividends provided to the Defendants that were used to pay their parents). These dividend payments to the Defendants ceased in 1999. After the TMC Sale, Steven became the President of TMC and Ira was an employee and an officer in the company. Sandra was not employed by TMC, but her husband, Defendant Jeffrey Cohen, was employed as the Vice President of Consumer Product Sales.

### 2. TMC's Expansion

In 1998 TMC expanded and acquired two companies: Saunders Photo-Graphic, Inc. and S.P. Acquisition Corporation. Saunders Photo-Graphic, Inc. was a manufacturer and worldwide distributor of camera accessories, and S.P. Acquisition Corp. was the worldwide licensee of Kodak books (the "Saunders Acquisition"). The purchase price for the sale was $10 million, which was partially financed by a $7 million loan from European and American Bank and Manufacturers and Traders Trust Company (collectively, the "Banks") (the "Saunders Loan"). The $3 million balance came from the cash from the acquired corporations. Although the companies became part of TMC's corporate structure, TMC was not the borrower under the $7 million loan. The borrowers were Steven Tiffen, Ira Tiffen, Barbara Mendelson and Sandra

---

[2] After the purchase, Ira and Sandra both gifted their sister, Barbara Mendelson, 2.5 shares of their stock in TMC.

Cohen, and they were personally liable to the Banks for the monthly payments.[3] The Saunders Loan was structured through the Defendants for tax considerations. TMC was an "S" corporation and Saunders Photo-Graphic, Inc. and S.P. Acquisition Corporation were both "C" corporations. If TMC was the borrower under the Saunders Loan and it acquired the companies, then the transaction would have changed TMC's corporate status into a "C" corporation. Under a "C" Corporation the taxes can be paid at both the corporate level and at the personal level. In an "S" Corporation the profits and losses of the business are reported on the owners' personal tax returns and the owners pay any tax due. In order to prevent possible double taxation that would result from TMC becoming a "C" Corporation the Saunders Loan was structured through the individual owners: Steven, Ira, Barbara and Sandra at the Defendants' requests. For tax purposes they would be viewed as having made an investment in TMC, which would preserve TMC "S" Corporation status. The loan proceeds were treated by the corporation as an investment by the Defendants into TMC. TMC used these loan proceeds to close the Saunders Acquisition.

As the borrowers under the Saunders Loan, the Defendants, not TMC, were liable for the monthly payments to the bank. TMC began issuing dividend payments to the Defendants in an amount equal to their monthly payments due under the Saunders Loan (the "Saunders Loan Dividends"), which the Defendants used to pay their monthly obligations.[4] This was similar to the dividends that TMC issued to the Defendants that the Defendants used to pay their monthly obligations to their parents under the terms of the TMC Sale agreement. In both cases it was TMC, not the Defendants individually, who was paying the Defendants' monthly obligations.

---

[3] Under the Saunders Loan, the Banks were to receive the following payments: (a) twelve monthly payments of $83,333.00 from May 31, 1998 through April 30, 1999; (b) twelve monthly payments of $100,000.00 from May 31, 1999 through April 30, 2000; (c) twelve monthly payments of $116,667.00 from May 31, 2000 through April 30, 2001; (d) twelve monthly payments of $133,333.00 from May 31, 2001 through April 30, 2002; and (e) twelve monthly payments of $150,000.00 from May 31, 2002 through April 30, 2003. The maturity date on the loan was April 30, 2003.

[4] TMC's 1998 Audited Financial Statement states that "[TMC] anticipates paying monthly dividends to the shareholders equivalent to the required payments of principal and interest [on the Saunders Loan]."

When TMC received the monthly statements from the Banks, at the request of the individual Defendants, TMC issued the Saunders Loan Dividends into four bank accounts. Each of these accounts were jointly held in the name of TMC's then controller (Stacey Gonzalez) and one of TMC's four shareholders (Steven Tiffen, Ira Tiffen, Sandra Cohen, and Barbara Mendelson) (the "Gonzalez Accounts"). After the dividends were issued into the Gonzalez Accounts, Ms. Gonzalez would transfer the funds to the Banks to pay the monthly obligation. There was no evidence that the Defendants personally withdrew any money from these accounts.

### 3. The Creation of The Tiffen Company, LLC

In 1999 TMC continued to expand by entering into a Contribution Agreement with Eastman Kodak Company ("Kodak"). Kodak licensed its brand to TMC, and the companies formed a new limited liability company called The Tiffen Company, LLC ("Tiffen LLC"). In December 1999 the newly formed Tiffen LLC purchased Kalimar Inc., which manufactured and distributed cameras and accessories, had a large client base that included Walmart, Best Buy and Target, and held a license with the Barbie line of dolls.

That same month TMC combined all of its remaining assets with Tiffen LLC and it became Tiffen LLC's managing entity. Tiffen LLC also entered into various licensing and supply agreements with Kodak. To facilitate the continued expansion of the business, Tiffen LLC received a $20 million capital contribution from Centre Capital Investors II, L.P. ( "Centre Partners"), an outside investment group. In exchange for its investment, Centre Partners received 2 million preferred units of stock in Tiffen LLC.[5] Tiffen LLC's equity interests were divided as such: (a) TMC had a 66.95% interest; (b) Centre Partners had a 27.62% interest; and (c) Kodak had a 5.43% interest. Both Centre Partners and Kodak also had a "put right", which would have

---

[5] Centre Partners filed proofs of interest in the Debtors' cases as equity holders of Tiffen LLC.

permitted them to convert their stock interests in Tiffen LLC into cash if certain preconditions were met.

On December 13, 1999 the Saunders Loan was amended to reflect the creation of Tiffen LLC, and a "Second Amended and Restated Credit Agreement" was entered into between Tiffen LLC and the Banks (the "Second Amended Credit Agreement"). The Second Amended Credit Agreement defined Tiffen LLC as the "Borrower" under the Saunders Loan, and provided that Tiffen LLC guaranteed the Defendants' obligations under the loan to the Banks. The Saunders Loan Dividends continued to be issued to the Defendants.

With the formation of Tiffen LLC in December 1999, Steven's, Ira's, and Jeffrey's roles in the company changed and their responsibilities increased. Steven Tiffen became the President and Chief Operating Officer of Tiffen LLC, and Ira Tiffen became an Executive Vice President of Research and Development. Jeffrey Cohen's job in the company changed from sales to one in consumer products management and development. Around December 1999, with the formation of Tiffen LLC, the salaries of Steven, Ira, and Sandra's husband Jeffrey Cohen increased (the "Salary Increases"). The business expanded from just TMC, which focused just on manufacturing and selling of photographic supplies and equipment, to encapsulating four additional businesses: Tiffen LLC, Saunders Photo-Graphic, Inc., S.P. Acquisition Corporation, and Kalimar. The scope and breadth of the Defendants' jobs also expanded to oversee those businesses and the development of additional products and revenue streams, beyond what TMC alone had done.

At this time TMC ceased issuing the dividends to Steven, Ira, and Sandra that they used to pay their parents under terms of the TMC Sale agreement. As the TMC Sale agreement

required that the Defendants make 180 monthly payments to their parents, the Defendants used the increase in their salary to continue to pay their parents.

As noted above, TMC was an "S" Corporation, and as such the Defendants, as its shareholders, had to personally pay taxes related to their income and liabilities from the business. However, TMC began issuing dividends to the Defendants in sums equal to the Defendants' tax obligations (the "Tax Dividends"). Again, it was TMC, not the Defendants, that was paying the Defendants' financial obligations.

### 4. Tiffen LLC's Decline

As quickly as Tiffen LLC began to expand, it also began to decline. In 2001 Tiffen LLC failed to comply with certain reporting requirements to the Banks and it had borrowing base shortfalls with the Banks as high as $3 million, all of which constituted defaults under the loan agreements. However, the Banks did not accelerate the debt and allowed Tiffen LLC time to continue to operate and attempt to rectify its financial issues. In September 2001 Centre Partners loaned the company an additional $5 million. This $5 million was carried on the Debtors' books and records as debt, not equity. These funds were utilized by Tiffen LLC to develop patents and technologies, such as its Bubble Cam technology, which allowed children to take pictures with a camera by squeezing its sides. This technology along with licenses from Barbie and SpongeBob SquarePants allowed Tiffen LLC to further expand its client base and appeal to customers.

This increase in the company's appeal was seen in January of 2002 when, after revealing its line of products at the National Consumer Electronics Trade Show, Tiffen LLC received orders from several businesses, such as Walmart and K-Mart. However, as many of these products were made in China, Tiffen LLC needed open letters of credit to manufacture the products that were ordered as a result of the electronics trade show, and ship those products to its

customers in the United States. It attempted to get additional financing from M&T Bank, and while M&T did advance funds to Tiffen LLC throughout 2002, the parties were unable to agree on terms for long term financing. The inability to get the long term financing prevented Tiffen LLC from getting the letters of credit that it needed and delayed the delivery of its products from China at about this time. The delay caused Tiffen LLC to spend approximately $1 million to air-freight products that were only worth approximately $100,000. Tiffen LLC incurred these shipping expenses in order to maintain its relationships with its customers, but caused it to experience large losses. Around this time the Debtors were becoming insolvent as they were unable to pay their bills as they came due, and were unable to get the necessary comprehensive financing. At this time, the Debtors were inadequately capitalized.

Due to the absence of long term financing from M&T, or others, Tiffen LLC abandoned an additional $25 million in purchase commitments for the fourth quarter of 2002, which further damaged the company's financial condition. On October 1, 2002 Centre Partners instructed Tiffen LLC to stop paying the Banks and to stop paying royalties to Kodak. At this time the Debtors were no longer paying their debts as they came due. Centre Partners wanted Tiffen LLC to focus on restructuring the capital and debt structure of the company. In attempting to do so, Tiffen LLC tried to find other financing for its business, but could not.

In a damaging blow to the company, on February 27, 2003 Kodak informed Tiffen LLC that it planned to pull its license from the company since it was no longer receiving its royalty payments. The next day, February 28, 2003, Tiffen LLC filed its Chapter 11 bankruptcy petition. On the petition date Tiffen LLC was clearly insolvent as its assets were valued at $18,031,203.28, and its liabilities were $28,194,217.77 as provided by Tiffen LLC's filings with the Court. Within the next few months Tiffen LLC's affiliates (TMC, Saunders Photo-Graphic,

Inc., HTN Photo, Inc., and S.P. Acquisitions Corp.) also filed chapter 11 petitions for relief.[6] They too were clearly insolvent.

On August 5, 2003 the Court approved the sale of substantially all of the Debtors' assets to an entity named Tiffen Acquisition, LLC for $5.25 million, with an additional $3 million note tied to the collection of the Debtors' ineligible receivables and inventory. The Court also approved the substantive consolidation of the Debtors' five related cases. The Debtors remained in chapter 11 for approximately one year, but they were financially unable to formulate a plan of reorganization. As a result, on June 8, 2004, this Court converted the Debtors' cases from chapter 11 to chapter 7, and the Plaintiff was appointed as the case trustee.

## Discussion:

In 2005 Trustee commenced the instant adversary proceedings against Defendants asserting seven causes of action to recover transfers from the Debtors to Defendants between January 2001 and February 2003. Specifically, Trustee seeks to recover the increases in salary that Defendants received upon the formation of Tiffen LLC (the "Salary Increases"), the Saunders Loan Dividends and the Tax Dividends (collectively, the "Transfers") as having damaged the Debtors' estates and their creditors. There is a temporal overlap in Trustee's causes of action as Trustee's First through Fourth Causes of Actions seek damages from January 2001 through February 2003, and Trustee's Fifth through Seventh Causes of Action seek damages from February 2002 through February 2003. Trustee's Complaint does not seek damages from Defendants for any period of time prior to January 2001 or after February 2003.

### I. Trustee's First, Second, Third and Fifth Causes of Action

---

[6] Tiffen Manufacturing Corp. filed its chapter 11 petition on April 23, 2003 (Case No. 03-82765-dte). Saunders Photo-Graphic, Inc. (Case No. 03-84721-dte), HTN Photo, Inc. (Case No. 03-84722-dte), and S.P. Acquisitions Corp. (Case No. 803-84723-dte) filed their respective chapter 11 petitions on July 15, 2003.

Trustee's First (N.Y. DCL § 273)[7], Second (N.Y. DCL § 274)[8], Third (N.Y. DCL § 275)[9] and Fifth Causes of Action (11 U.S.C. § 548 (a)(1)(B))[10] seek to avoid the Transfers made by the Debtors to Defendants between January 1, 2001 through February 27, 2003 under a theory of constructive fraud. The Trustee seeks to recover the funds for the benefit of the Debtors' estate, plus interest thereon, pursuant to 11 U.S.C. § 550(a).[11]

The terms "reasonably equivalent value" in section 548(a)(1)(B) and the terms "fair consideration" in the DCL have the "same fundamental meaning" and are interpreted similarly by the courts. *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 677 (Bankr. S.D.N.Y. 2000); *Kittay v. Peter D. Leibowits Co. (In re Duke & Benedict, Inc.)*, 265 B.R. 524, 530 n.7 (Bankr. S.D.N.Y. 2001). Thus, the Court will address the Trustee's First, Second, Third and Fifth Causes of Action together.

---

[7] N.Y. DCL § 273. Conveyance by insolvent:
Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

[8] N.Y. DCL § 274. Conveyances by persons in business:
Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

[9] N.Y. DCL § 275. Conveyances by a person about to incur debts:
Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

[10] Section 548(a)(1)(B) states that a trustee can avoid a voluntary "transfer of an interest of the debtor in property" that was made within one year before the petition date if the debtor:
(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
11 U.S.C. § 548(a)(1)(B) (2011).

[11] Bankruptcy Code § 550 provides that if a trustee avoids a transfer, then the trustee can recover the "property transferred" or the "value of such property…." 11 U.S.C. § 550 (2011).

In order to prevail on a claim of constructive fraud the plaintiff must prove by a preponderance of the evidence that (1) the debtor did not receive fair consideration for the transfer, and (2) the debtor was either insolvent at the time of the transfer or was rendered insolvent because of the transfer. *See Banner v. Lindsay (In re Lindsay)*, No. 08-9091, 2010 Bankr. LEXIS 1554, *21 (Bankr. S.D.N.Y. May 4, 2010); *Geltzer v. Borriello (In re Borriello)*, 329 B.R. 367, 373 (Bankr. E.D.N.Y. 2005). If the debtor did not receive fair consideration, then it is presumed that the transfer made the debtor insolvent, and the burden is on the defendant to rebut this presumption. *See e.g., Geron v. Schulman (In re Manshul Constr. Corp.)*, No. 99-2828, 2000 U.S. Dist. LEXIS 12576, *150 (S.D.N.Y. Aug. 29, 2000). If the defendant "come[s] forward with some evidence of [the debtor's] solvency", then the burden shifts back to the plaintiff to prove that the debtor was insolvent and that the transfer was therefore a fraudulent conveyance. *See In re Manshul Constr. Corp.*, 2000 U.S. Dist. LEXIS 12576, *150-51; *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 672 (Bankr. E.D.N.Y. 2008).

### A. <u>Fair Consideration</u>

In analyzing fair consideration under the DCL and the Bankruptcy Code, the Court measures what was given and what was received in the transaction at issue. *See* N.Y. DCL § 272 (2011); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 803 (Bankr. S.D.N.Y. 2005); *In re Borriello*, 329 B.R. at 374. The Second Circuit in *Rubin v. Manufacturers Hanover Trust Co.* stated that:

> if the debtor receives property … that is substantially equivalent in value to the property given … in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain. By the same token, however, if the benefit of the transaction to the debtor does not substantially offset its cost to him, then his creditors have suffered, and … the transaction was not supported by "fair" consideration.

661 F.2d 979, 991 (2d Cir. 1981).

a.  <u>The Salary Increases</u>

Trustee's Complaints seek to recover the Salary Increases that Defendants Steven Tiffen, Ira Tiffen, and Jeffrey Cohen received from the Debtors within the two years of the Debtors' bankruptcy filings. Trustee's position is that Steven Tiffen's and Ira Tiffen's salaries were increased so they could pay their monthly obligations to their parents under the terms of the TMC Sale agreement. Trustee argues that Defendant Jeffrey Cohen's salary was increased so that he would give the funds to his wife, Defendant Sandra Cohen, and she would use the funds to pay her monthly obligations to her parents. It is Trustee's position that the Debtors did not receive fair consideration for the salary increases paid to Steven Tiffen, Ira Tiffen and Jeffrey Cohen, and the salary increases were excessive and improper. Trustee seeks: (a) $237,416.52 from Defendant Steven Tiffen; (b) $78,799.06 from Defendant Ira Tiffen; and (c) $78,799.06 from Defendant Jeffrey Cohen for the salary increases only.

Case law has established that payments of salary are presumed to be made for fair consideration, and in order for a trustee to avoid them he must establish that the salary payments were in bad faith or the payments were excessive in light of the Defendants' employment responsibilities. *See e.g., Anderson & Assocs. PA v. S. Textile Knitters De Hond. Sewing Inc. (In re S. Textile Knitters)*, 65 Fed. Appx. 426, 437 (4th Cir. 2003); *Cilco Cement Corp. v. White*, 55 A.D.2d 668, 668 (2d Dep't 1976) (holding that the salary paid to the president of the company was not a fraudulent conveyance because there was "no evidence that his salary was either excessive or unreasonable, or that the corporation did not receive full value in return."); *Mills v. Everest Reinsurance Co.*, 410 F. Supp. 243, 254 (S.D.N.Y. 2006).

The deposition testimony of Ira Tiffen, Sandra Cohen and Jeffrey Cohen[12] shows that they believed they would obtain additional funds from the Debtors in the form of additional salary which they would use to make their required monthly payments under the TMC Sale agreement. The increases in Defendants' salaries occurred around the time of the formation of Tiffen LLC in 1999 and from that point on Defendants received salaries in those amounts leading up to the Debtors' multiple bankruptcy filings in 2003. Stacey Gonzales, the Vice-President of Finance and Operations of Tiffen LLC, testified that in the weekly payroll checks to Defendants there was an additional allocation made for the monthly obligations owed to Defendants' parents under the TMC Sale agreement. (Tr. 7/15/09, pg. 119). However, with the formation of Tiffen LLC Defendants received increased responsibilities and higher positions. As noted above, Steven Tiffen became the Chief Operating Officer and President, Ira Tiffen became Executive Vice President of Research and Development, and Jeffrey Cohen was promoted from sales to consumer products management and development. In addition, the company's financial status also increased as it went from earning approximately $40 million in net sales in 1999 to earning $73 million in 2000 and $67 million in 2001.

While Defendants' salaries increased after the formation of Tiffen LLC, Trustee has failed to establish that some or all of the salary increases were not warranted based upon the increased size and function of the Debtors, and Defendants' new roles in the company. In addition Trustee failed to establish that the salary increases were excessive or in bad faith. The mere fact that the salary increases appear to match the increase of payments necessary to cover the payments to the parents for Defendants' purchase of TMC is not enough for Trustee to prevail. Trustee has not provided evidence showing a lack of value or diminished quality of work

---

[12] By stipulation dated July 20, 2009 the parties agreed that certain designated testimony of Steven Tiffen, Ira Tiffen, Barbara Mendelson, Sandra Cohen and Jeffrey Cohen would be admitted into the Trial record.

or diminution of effort on behalf of these employees for the Debtors, and has not sustained his burden. The Court finds that the Debtors received fair consideration for the Salary Increases.

b. <u>The Saunders Loan Dividends</u>

Trustee's First, Second, Third and Fifth Causes of Action seek to void and recover the Saunders Loan Dividends that were issued by TMC to Defendants between January 1, 2001 through February 27, 2003. The funds were used by Defendants to pay their monthly obligations to the Banks under the Saunders Loan. Trustee established that Defendants were issued the following sum of Saunders Loan Dividends: (a) Steven Tiffen received $911,060.32 in 2001 and $768,160.07 in 2002; (b) Ira Tiffen received $391,756.78 in 2001 and $330,308.63 in 2002; (c) Sandra Cohen received $391,756.75 in 2001 and $330,308.63 in 2002; and (d) Barbara Mendelson received $89,100.13 in 2001 and $76,816.16 in 2002.

Trustee asserts that the Debtors did not receive fair consideration for the Saunders Loan Dividends. However, it is undisputed that the proceeds of the Saunders Loan were utilized by TMC to close the Saunders Acquisition. The Saunders Acquisition benefitted TMC (and later the Debtors) by enabling TMC to expand its business and its client base. TMC's 1999 Financial Statements shows that TMC's assets grew by approximately $20 million after the Saunders Acquisition in 1998. While TMC benefited from the proceeds of the Saunders Loan, it was the Defendants that shouldered the personal liability on the loan. The Debtors issued the Saunders Loan Dividends to Defendants, which Defendants used to pay their monthly obligations to the Banks. Furthermore, a review of the Second Amended Credit Agreement, which Tiffen LLC entered into with the Banks, shows that Tiffen LLC guaranteed the payment of Defendants' obligations under the Saunders Loan, and had Defendants failed to make those payments then Tiffen LLC would have been liable.

The Second Amended Credit Agreement, dated December 13, 1999, defined Tiffen LLC as the "Borrower" under the Saunders Loan, and provides in Section 10.15 that:

> <u>Guaranty</u>.  The Borrower unconditionally and irrevocably guarantees the full and prompt payment when due, whether at stated maturity, by acceleration or otherwise … of all obligations (monetary or otherwise) of each Tiffen Family Member under or in connection with the Tiffen Family Loan Agreement or any other Loan Document (as defined therein) entered into in connection therewith (collectively, the "Tiffen Family Obligations"), whether for principal, interest, fees, expenses or otherwise and including any and all costs and expenses … *The foregoing guaranty constitutes a guaranty of payment when due and not merely of collection, and the Borrower specifically agrees that it shall not be necessary or required that the Agent of any Lender exercise any right, assert any claim or demand or enforce any remedy whatsoever against any Tiffen Family Member of any other Obligor before or as a condition to the obligations of the Borrower hereunder*." (emphasis added).

The Second Amended Credit Agreement defined the term "Tiffen Family Member" to be "collectively, Steven Tiffen, Ira Tiffen, Barbara Mendelson and Sandra Cohen." It is clear that the proceeds of the Saunders Loan allowed TMC to close the Saunders Acquisition, and expand and build its business. As of December 1999 the Debtors were not insolvent, and there was fair consideration. That fair consideration extended through the petition date because the Debtors had already received the benefits from the Saunders Acquisitions, and the Debtors were making payments over time for that consideration. Therefore, the Court finds that the Debtors received fair consideration for the Saunders Loan Dividends.

c.  <u>The Tax Dividends</u>

Under Trustee's First, Second, Third and Fifth Causes of Action, Trustee seeks to recover the Tax Dividends issued by the Debtors to Defendants between January 1, 2001 through February 27, 2003. Defendants used these monies to pay their personal tax liabilities relating to the business. Trustee established that the Tax Dividends issued to Defendants during this period

16

were: (a) $205,000.00 to Steven Tiffen; (b) $169,760.58 to Ira Tiffen; (c) $313,244.00 to Sandra Cohen; and (d) $31,100.00 to Barbara Mendelson.

As noted above, TMC was an "S" Corporation, and as such the tax liabilities fell on the shoulders of the individual owners of the business. *See e.g., Bufferd v. Comm'r*, 506 U.S. 523, 524-25 (1993) (noting that "S" corporations are established to create a "pass-through system under which corporate income, losses, deductions, and credits are attributed to individual shareholders in a manner akin to the tax treatment of partnerships."); *Nathel v. Comm'r*, 615 F.3d 83, 85 (2d Cir. 2010) ("S corporation profits are not taxed on the corporate level; instead they are passed through as taxable income to shareholders on a pro rata basis."); *United States v. Farley*, 202 F.3d 198, 200 (3d Cir. 2000).

Defendants chose to maintain the "S" Corporation status of the Debtors, which meant that Defendants, as the shareholders, were personally liable for the taxes. It was improper for the Debtors to issue the Tax Dividends and essentially pay Defendants' personal tax obligations. There is no shown consideration provided to the Debtors for these payments. Thus, the Court finds that the Debtors did not receive fair consideration for the Tax Dividends, and the Court must determine whether the Debtors were solvent when the Tax Dividends were issued to Defendants. As noted below, Defendants have failed to show that the Debtors were solvent on the dates of all of these transfers.

### B.  Insolvency

The Court analyzes a debtor's solvency on the date of the transfer in question. *See Durand v. Ackerman (In re Durand)*, No. 09-3372, 2010 U.S. Dist. LEXIS 101755, *26-27 (E.D.N.Y. Sept. 27, 2010); *WRT Creditors Liquidation Trust v. WRT Bankruptcy Liquidation Master File Defendants (In re WRT Energy Corp*.), 282 B.R. 343, 368 (Bankr. W.D. La. 2001)

(stating that solvency is determined on the date of the complained of transfer). Insolvency is defined as "when the present fair salable value of [a company's] assets is less than the amount that will be required to pay [the company's] probable liability on existing debts as they become absolute and matured." DCL § 271; 11 U.S.C. § 101(32) (defining "insolvent" as a "financial condition such that the sum of [an] entity's debts is greater than all of [the] entity's property, at a fair valuation . . . .").

Both Trustee and Defendants valued the Debtors as a going concern so the Debtors' fair value "is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts." *Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30, 35 (2d Cir. 1996). Defendants must establish the Debtors' solvency at the times that the Tax Dividends were issued.

1.  Defendants' Evidence of Solvency

Defendants retained David E. Berliner, CPA, CIRA, CTP ("Berliner") as their solvency expert.[13] At trial Berliner testified that through the period of January 1, 2001 until at least September 30, 2002, the Debtors were solvent. In valuing Tiffen LLC, Berliner assigned values to its: (i) then-present assets, including cash, receivables, inventory, pre-paid items, machinery and equipment; (ii) long-term assets, including vehicles, machinery, computers, equipment, and building improvements; and (iii) intangible assets. A significant component of Defendants' expert's solvency valuation was the valuation of the Debtors' intangible assets.

a.  **Defendants' Valuation Of The Debtors' Intangibles Assets**

Debtors' intangible assets were patents, unpatented know-how, trademarks, licensing agreements, and customer relationships. Defendants' solvency expert, Berliner, utilized the

---

[13] Berliner is a Partner in BDO Consulting and has over 30 years experience, with extensive advisory and consulting experience in the areas of fraud and fraudulent transfers.

intangibles valuation of Defendants' other expert, G. William Kennedy, who valued the Debtors' intangible assets at $23,410,000.00. Berliner's solvency report also contains a category for "goodwill", which is in addition to the "intangibles" valuation. Berliner's "goodwill" analysis valued the Debtors' "goodwill" for the period of January 2001 through September 2002 in the range of approximately $11,583,000 (in January 2001) to $12,150,000 (in September 2002). This range is consistent throughout the months between January 2001 and September 2002.

Trustee objected to Defendants' intangibles' valuation on the grounds that the valuation was based on unreliable information. Specifically, Trustee argues that the analysis was based on communications with Debtors' management, which Trustee claimed was biased in favor of the Debtors, the Debtors' sales projections for 2004 through 2006, and a 2003 budget ("2003 Budget") used by the Debtors. According to Trustee any projections utilized cannot be evidence as they are only conjecture and represent only a potential economic future. As for the 2003 Budget, it was not entered into evidence and Trustee argued that there was no testimony as to why that budget was created or utilized by Defendants' expert. It is Trustee's belief that the 2003 Budget was created based upon information derived from Defendants in early 2002 as to "certain understandings of Tiffen LLC's business" and "by the fourth quarter 2002[] those forecasts were no longer relevant." (Plaintiff's Findings of Facts, pg. 65).

The Court finds that the evidence presented supports Trustee's arguments as to the unreliability of Defendants' intangibles valuation expert. Although there was some discrepancy as to why the Court should or should not consider the testimony of Kennedy, the Court has heard and evaluated the weight of his testimony and finds that it does not elevate his conclusions to the level of acceptability, and the Court does not find his analysis credible. An analysis based on future sales projections is insufficient for establishing valuation of the Debtors' intangibles

because the projections are based on speculation and assumptions. There is no evidence that any specific intangible had any value independent of its value in an ongoing business. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 108 (2d Cir. 2011) ("Estimates of goodwill depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact."). Unpatented know-how and customer relations only have value in an ongoing business. Furthermore, the value of the Debtors was tied into its contracts with Kodak and its various licenses. As the business began to fail and the Debtors ceased making its royalty payments to Kodak around October 2002, the Debtors risked the loss of these contracts and licenses, which would likely further devalue the business' intangibles. Indeed, after Kodak notified the Debtors of its plan to pull the license, TMC filed for bankruptcy.

The Court's review of TMC's 1998, 1999 and 2000 Financial Statement (the "Financial Statements") shows that TMC's accountants valued TMC's intangibles as follows: $2,938,919 in 1997, $12,052,188 in 1999, and $11,512,262 in 2000.[14] In addition, a preliminary draft of TMC's 2001 Financial Statement shows that for that year the intangibles were valued around $12 million. This was at a time when Debtors' business was at its peak. However, once the Debtors ceased paying its bills, without evidence of a stated value for a specific item of property, the value of Debtors' "intangible properties" became a guess. The Debtors' Financial Statements calculated a valuation of the Debtors' intangibles that is consistent with the valuation that the Defendants' expert, Berliner, attributed to the Defendants' "goodwill" for January 2001 through September 2002, and would have included any known intangibles.

If the Court deducts the Defendants' intangibles valuation and leaves the Defendants' goodwill valuation, then according to Berliner's solvency analysis the Debtors were insolvent

---

[14] The approximate $10 million increase in the value of TMC's intangibles in 1999 from 1998 is likely attributed to the Saunders Acquisition. The relatively minor difference in the value of TMC's intangibles between 1999 and 2000 indicate a low level of fluctuation in the value of the intangibles from year to year.

20

from the end of February 2002/early March 2002 through the date the Debtors filed their bankruptcy petitions in February 2003. It is clear from the totality of the Debtors' financial condition that the Debtors were inadequately capitalized at this time, and could not financially perform on all of their business obligations. This is supported by the fact that the Debtors were unable to pay their obligations as they came due, and they had to borrow $5 million from M&T Bank and Centre Partners in both 2001 and 2002. Therefore, the Court finds that Defendants have failed to establish the Debtors' solvency from the period of the end of February 2002/beginning March 2002 through February 2003, and the Debtors were insolvent during that period of time.

### b. Kodak and Centre Partners' Stock Interest In The Debtors

The Trustee argues that Berliner's entire analysis is invalid, and that the Debtors were insolvent from January 2001 through February 2003. Specifically, Trustee argues that Berliner failed to classify the ability of both Kodak and Centre Partners to convert their stock interests in Tiffen LLC into cash as a liability for the Debtors (the "Put Rights"). According to Trustee, had Berliner classified the "put rights" as a liability, it would have resulted in the conclusion that the Debtors were insolvent on the dates of all of the Transfers. Defendants argue that the "put rights" should not be classified as a liability as Kodak and Centre Partners made equity investments into TMC.

As acknowledged in the Amended and Restated Operating Agreement, Centre Partners contributed $20 million to Tiffen LLC and in exchange they received 2,000,000 Preferred Units in LLC. The Amended and Restated Operating Agreement dated December 13, 1999 states in Article 3.2(c):

> Put Right. If the Company (or a successor to the Company) shall not have
> consummated a Qualified Public Offering prior to the fifth anniversary of this

Agreement, then on such fifth anniversary and on each anniversary thereafter, the Preferred Members [the Centre Partners and Kodak] shall have the right, which may be exercised only twice upon the Majority Preferred Holders giving the Manager written notice not more than sixty (60) days prior to such anniversary ("Redemption Notice") to require the Company to redeem, and the Company shall be obligated to redeem, all or any portion of the Preferred Units for cash at the fair value of such Units as of the date of the Redemption Notice (without giving effect to any minority discount or control premium, which fair value shall be no less than the fair value of the Common Units into which the Preferred Units are then convertible. . . .

(Plf. Ex. 82 at 26).

In support of his argument, Trustee notes that his solvency expert, Goodman, reclassified Centre Partners' and Kodak's stock interest as liabilities of the Debtors. Trustee's expert argued that when equity has the characteristics of debt it should be treated as a liability or quasi-liability.[15] In support of his position, Trustee's expert relies on Financial Accounting Standards Board, Pronouncement 150 ("FAS-150"). FAS-150 requires equity to be reclassified if the equity holder receives interest payments and if the equity interest is mandatorily redeemable for cash. (Tr. 6/24/09, pg. 183). However, at Trial Trustee's expert acknowledged that neither of these characteristics applied to Kodak or Centre Partners preferred units, and FAS-150 was not in effect at the time of the bankruptcy filing, and was not retroactive. (Tr. 7/15/09, pg. 80-81, 84).

Furthermore, an analysis of the "Put Right" shows that in order for Kodak or Centre Partners to redeem their preferred units for cash Tiffen LLC would have had to fail to consummate a qualified public offering prior to the fifth anniversary of the agreement which would have been on December 13, 2004. Kodak and Centre Partners only had the "right" to exercise the redemption at that time, and it was not mandatory. No evidence has been introduced that the right to redeem the preferred units for cash was ever exercised prior to the fifth

---

[15] Defendants' Counsel: … The basis for your recharacterization is that when equity has the characteristics of debt it should be treated as a liability or a quasi-liability, right?
Goodman: It's not my basis. It's the basis of accounting procedures and generally accepted accounting principles. (Tr. 6/24/09, pg. 181)

anniversary, or that the conditions precedent had occurred. It could not be exercised until December 2004, and Tiffen LLC filed its chapter 11 petition in February 2003. Furthermore, Centre Partners filed proofs of interest in the Debtors' cases as equity holders of Tiffen LLC. The Court finds that Kodak and Centre Partners were equity owners and therefore the "Put Right" did not have to be classified as a liability.

2. Plaintiff's Insolvency Analysis

As noted above, the Court has already found that the Debtors were insolvent from the end of February 2002/beginning March 2002 through February 2003. Trustee's expert, Michael P. Goodman, CPA ("Goodman")[16], testified that the Debtors were insolvent from January 2001 through February 2003. Goodman reviewed the Debtors' tax returns, financial statements and accounts receivables for the years 1999 through 2003. Goodman primarily relied on the Debtors' tax returns, specifically the tax returns for 1999, 2000, 2001, and 2002. By utilizing these documents, Goodman formulated a balance sheet for the Debtors for the years 1998 through 2002. He then made downward adjustments to the Debtors' accounts receivables and its goodwill, and he accelerated the Debtors' debts for purposes of his adjusted balance sheet analysis. He also recharacterized the Centre Partners "Put Right" as a liability, which the Court has determined was improper.

In his analysis, Goodman was only able to determine that the Debtors were insolvent on December 31, 2000, December 31, 2001, December 31, 2002, and February 28, 2003. He was unable to testify regarding the solvency of the Debtors on any other dates, particularly the dates of the Transfers. (Tr. 6/24/09 at 150-151). Goodman's insolvency analysis relies on the theory of retrojection to argue that the Debtors were insolvent on the dates of all of the Transfers.

---

[16] Goodman is the Managing Partner of Janover Rubinroit, LLC, an accounting firm.

Under retrojection, if it can be established that the debtor was insolvent at the beginning and end of a time period, then a court can find that a debtor was insolvent during the time period between those dates. *See e.g., Killips v. Schropp (In re Prime Realty, Inc.)*, 380 B.R. 529, 535 (B.A.P. 8th Cir. 2007); *In re Sullivan*, 161 B.R. 776, 783 (Bankr. N.D. Tex. 1993) (allowing the trustee to utilize retrojection where the debtor's financial condition was "unascertainable" and the trustee was able to show that the debtor was insolvent both six months before and six months after the date of the transfer). The party seeking to use retrojection, here Trustee, must establish (1) the absence of any books and records that would assist him, or his expert, in ascertaining the debtor's financial condition, and (2) the absence of any radical or substantial change in the debtor's assets or liabilities between the retrojection dates. *See e.g., Hassan v. Middlesex County Nat'l Bank*, 333 F.2d 838, 840-41 (1st Cir. 1964); *New York Credit Men's Adjustment Bureau, Inc. v. Adler*, 2 B.R. 752, 756, n.5 (S.D.N.Y. 1980) ("[retrojection is] the only reliable means of determining solvency when the basic data normally available, such as books and inventory, are incomplete or missing."). However, the Trustee cannot establish either of these two conditions.

The Debtors' books and records were available to be used by Trustee's expert as evidenced by the fact that the Defendants' own expert utilized them in his analysis.[17] In addition, there were substantial changes in the Debtors' liabilities during the periods at issue. The record is clear that in September 2001 the Debtors' received a $5 million loan from Centre Partners, and in August 2002 the Debtors' received a $5 million loan from M&T. These were changes to the Debtors' liabilities, which support the Trustee's contention that there was a downward trend for the Debtors. However, the Debtors books and records were available for the Trustee's expert to utilize, and his failure to do so renders him unable to avail himself of retrojection to prove

---

[17] Both the Plaintiff and the Defendants provided exhibits to the Court that contained copies of Tiffen LLC's monthly internal financial statements from January 2001 through February 2003. (Defendants' Ex. 26, Plaintiff's Ex 50).

insolvency on the dates of the Transfers. He cannot establish that the Debtors were insolvent from January 2001 through February 2002. The Court has already determined that there is sufficient evidence to establish that the Debtors were insolvent as of the end of February 2002/beginning March 2002.

### C.  The Court's Conclusions

The Trustee's causes of action under N.Y. DCL §§ 273, 274 and 275, and 11 U.S.C. § 548 (a)(1)(B) require that the Transfers be made without fair consideration. As the Debtors received fair consideration for both the Salary Increases and the Saunders Loan Dividends, the Trustee is unable to meet his burden under these causes of actions. Therefore Trustee's First, Second, Third and Fifth Causes of Action are dismissed with respect to Salary Increases and the Saunders Loan Dividends.

Trustee has established that the Tax Dividends were issued to Defendants without fair consideration, and the evidence shows that the Debtors were insolvent from the end of February 2002/beginning March 2002 through February 2003. Therefore, Trustee's First, Second, Third and Fifth Causes of Action are granted with respect to the Tax Dividends. The Tax Dividends issued by the Debtors to Defendants from the end of February 2002/beginning March 2002 through February 2003 were fraudulent conveyances, and are avoided.

### II.    *Trustee's Sixth Cause of Action*

The Trustee's Sixth Cause of Action seeks recovery of Transfers pursuant to 11 U.S.C. § 548(a)(1)(A). Under section 548(a)(1)(A), if a transfer was made with "actual intent to hinder, delay, or defraud" creditors, then the transfer can be avoided as an actual or intentional fraudulent conveyance regardless of whether the debtor actually received consideration in exchange for the transfer. *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l*

*Corp.*), 403 F.3d 43, 56 (2d Cir. 2005); *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994) ("[W]here actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given."); *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 304 (S.D.N.Y. 2010).

The debtor/transferor's intent is critical in this analysis. *See United States v. McCombs*, 30 F.3d at 328; *In re Bayou Group, LLC,* 439 B.R. at 304. As the fraudulent intent of a debtor is "rarely susceptible to direct proof", courts must determine whether certain "badges of fraud" exist that establish the debtor's intent at the time of the transfers. *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983); *see In re Sharp Int'l Corp.*, 403 F.3d at 56 (noting that "badges of fraud" are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent.") (internal citations and quotation marks omitted).

The Second Circuit in *In re Kaiser* articulated these "badges of fraud" to include:

(1) the lack or inadequacy of consideration;
(2) the family, friendship or close associate relationship between the parties;
(3) the retention of possession, benefit or use of the property in question;
(4) the financial condition of the party sought to be charged both before and after the transaction in question;
(5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
(6) the general chronology of the events and transactions under inquiry.

722 F.2d at 1582-1583. The establishment of several "badges of fraud" show "clear and convincing evidence of [the debtor's] actual intent." *In re Actrade Fin. Techs., Ltd.*, 337 B.R. at 809 (internal citations omitted). The Court has already determined that Trustee has not shown that the salaries were excessive or improper in light of Defendants' employment with the Debtors, and therefore the Trustee's Sixth Cause of Action with respect to the Salary Increases is

denied. The remainder of the Court's analysis focuses on the Saunders Loan Dividends and the Tax Dividends.

As to the first "badge of fraud", the lack of consideration, the Court has already determined that the Debtors received fair consideration for the Saunders Loan Dividends. The payment of the Saunders Loan Dividends to the Defendants only served to reduce the ultimate liability of the Debtors since the Debtors had guaranteed those payments. Had the Defendants failed to make those payments, the Debtors would have been obligated to pay the Banks directly. Conversely, there was no fair consideration for the Tax Dividends as the Debtors did not receive any benefit from said payments. Furthermore the Tax Dividends only served to benefit the Defendants personally. The failure of the Defendants to make their tax payments would have resulted in action against them by the taxing authorities, and not against the Debtors. The Trustee is only able to establish that the first "badge of fraud" has been met with respect to the Tax Dividends.

The second "badge of fraud", the relationship between the parties, is established because Defendants were the officers and shareholders of the Debtors.[18] In their role as the officers and shareholders, Defendants directed the issuance of the dividends to themselves over the course of several years.

Under the third "badge of fraud" Trustee must establish that the Defendants retained or used the funds. It is clear that the Defendants retained the benefit of the Tax Dividends, and used these funds to pay off their own personal tax obligations. However, as for the Saunders Loan Dividends, while the Defendants directed that the funds be transferred to the Banks, it was the

---

[18] It is undisputed that the Defendants are "insiders" of the Debtors by nature of their ownership interests in the Debtors and their employment with the Debtors. *See* 11 U.S.C. § 101(31)(B) (2011). Section 101 (31)(B) defines an "insider", where a debtor is a corporation, as the "director of the debtor", an "officer of the debtor", a "person in control of the debtor" or a "relative of a general partner, director, officer, or person in control of the debtor".

Banks, not the Defendants, that retained the benefit from the dividend payments. The Debtors would have been obligated to the Banks on their guaranty had the Defendants not made the payments, and in effect the Debtors were paying off their own obligations. Therefore, the Trustee is only able to establish the third "badge of fraud" with respect to the Tax Dividends, and not with respect to the Saunders Loan Dividends.

The fourth "badge of fraud" requires a finding of the financial condition of the party being charged both before and after the transfers. Again the Trustee is only able to establish this element as for the Tax Dividends. The Defendants received the Tax Dividends and utilized those funds as opposed to utilizing their own funds to make their tax payments. However, as for the Saunders Loan Dividends, the funds were transferred into the Gonzalez Accounts and were immediately transferred out to the Banks. The Defendants financial condition did not change because they barely had the funds in the first place.

As to the fifth and sixth "badges of fraud" the system of issuing the Saunders Loan Dividends to the Defendants was established in 1998 back when the only company in the Debtors' business was TMC. This was before Tiffen LLC was formed and before the business started to decline and become insolvent. The system was not established to deprive creditors of funds or to enrich the Defendants. Rather it was designed to maintain TMC's "S" Corporation status, and to repay the Banks for the funds needed to acquire the Saunders companies. Ultimately, the payments benefited the Debtors as they would have been obligated on the debt.

As for the Tax Dividends, they were enacted around the creation of Tiffen LLC, and as the Court noted Tiffen LLC had financial problems from nearly the beginning of its formation. The Tax Dividends persisted during a time that the Court has determined the Debtors were insolvent (the end of February 2002 through February 2003), and at a time when Debtors were

unable to pay their obligations as they came due. Furthermore, they provided no benefit to the Debtors. While the Tax Dividends do not rise to a level of illegality, and their payment may in fact be a common practice among some corporations, there was no consideration given for these dividends, and their issuance deprived the Debtors' creditors of those funds at a time when the Debtors were failing. The Trustee has established the fifth and sixth "badges of fraud".

Pursuant to the above facts, the Court finds that Trustee has established all six "badges of fraud" with respect to the Tax Dividends, and therefore the Tax Dividends paid within one year of the Debtors' filing must be avoided as fraudulent conveyances under section 548(a)(1)(A). As for the Salary Increases and the Saunders Loan Dividends, based upon the above reasoning, those transfers were not fraudulent conveyances. Thus, Trustee's Sixth Cause of Action is granted with respect to the Tax Dividends, and is denied as to the Salary Increases and the Saunders Loan Dividends.

### III.    Trustee's Fourth Cause of Action: Unjust Enrichment

Trustee's Fourth Cause of Action seeks to recover the Transfers made by the Debtors to the Defendants from January 1, 2001 through February 27, 2003 under the New York common law theory of unjust enrichment. In order to recover under this theory, a plaintiff must satisfy a three-prong test: (1) the defendant was enriched by the transfer, (2) such enrichment was at the plaintiff's, or here the Debtors', expense, and (3) equity and good conscience require the defendant to return the money or property to the plaintiff. *See Giordano v. Thomson*, 564 F.3d 163, 170 (2d Cir. 2009); *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001); *L.I. Head Start Child Dev. Servs. v. Econ. Opportunity Comm'n of Nassau County, Inc*., 634 F. Supp. 2d 290, 314 (E.D.N.Y. 2009). The determination that one has been unjustly enriched is "a legal inference drawn from the circumstances surrounding the transfer of property and the

relationships of the parties…." *Sharp v. Kosmalski*, 40 N.Y.2d 119, 123, 351 N.E.2d 721, 724, 386 N.Y.S.2d 72, 76 (1976).

As previously discussed, the Debtors received fair consideration for the Defendants' increased salary and the Saunders Loan Dividends. However, as for the Tax Dividends, it is clear Defendants were unjustly enriched. Defendants' tax obligations were personal to them and the tax obligations were not owed by the Debtors. TMC's tax structure as an "S" Corporation was maintained for the purposes of avoiding double taxation for the Debtors and Defendants. Instead of Defendants paying their tax obligations, they used TMC to issue the Tax Dividends to themselves and to pay their personal taxes. Debtors received no consideration for the Tax Dividends. The Court finds that in the interests of equity and good conscience, these funds should be returned to the Debtors' estate as these funds should have been available to creditors when Debtors were insolvent. Thus, Plaintiff's Fourth Cause of Action is granted with respect to the Tax Dividends, and is denied with respect to the Salary Increases and the Saunders Loan Dividends.

IV.    ***Trustee's Seventh Cause of Action***

Trustee's Seventh Claim seeks, under 11 U.S.C. § 547(b), to avoid transfers made by the Debtors to the Defendants within one year of the Debtors' bankruptcy filing. In order to recover under section 547(b), Trustee must establish each element of the cause of action, which includes a finding that the transfer at issue was to or for the benefit of a creditor. *See* 11 U.S.C. § 547(b) (2011); 11 U.S.C. § 547(g) (2011); *Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30, 34 (2d Cir. 1996). However, Trustee cannot establish this essential element because Defendants were not creditors of the Debtors.

The case cited at length by Trustee in support of his section 547(b) cause of action is *Nordberg v. Arab Banking Corp, (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 595 (11th Cir. 1990). That case involved litigation between a chapter 11 trustee of a debtor-corporation and a bank which loaned money to the debtor's principal. *Id.* at 592. The debtor guaranteed the principal's debt and made direct payments to the bank on account of that debt prior to filing for bankruptcy. *Id.* After the bankruptcy case was filed and a chapter 11 trustee was appointed and the trustee commenced an action under section 547(b) against the bank to recover those payments. The trustee did not sue the debtor's principal. *Id.* Here Trustee seeks to recover the Transfers from the Defendants personally. He does not seek recovery from the Banks with respect to the Saunders Loan Dividends or the taxing authorities with respect to the Tax Dividends. As for the Salary Increases, they were paid to the Defendants personally and there is no allegation that the Defendants were creditors of the Debtors with respect to those payments. The Transfers were made from the Debtors to Defendants, and Defendants used those funds to pay their personal obligations. There is no evidence to support a finding that Defendants were creditors of the Debtors. Therefore, Trustee's cannot establish this essential element of his Seventh Cause of Action, and it is dismissed.[19]

## <u>CONCLUSION:</u>

Based upon the above findings of facts and conclusions of law:

1. Trustee's First, Second, Third and Fifth Causes of Action are denied with respect to the Salary Increases and the Saunders Loan Dividends, and granted as to the Tax Dividends.

---

[19] The Court notes that in the Joint Pre-trial Statement filed and signed by the Defendants' counsel and Plaintiff's counsel (Adv. Pro. 05-8682-dte, ECF Docket No. 59), the Defendants "allege the following three affirmative defenses, each in connection with the Seventh Claim under 11 U.S.C. § 547(b): (i) ordinary course of business under 11 U.S.C. § 547(c)(2); (ii) new value under 11 U.S.C. § 547(c)(4); and (iii) contemporaneous exchange for new value under 11 U.S.C. § 547(c)(1)." The Court does not need to address these defenses as the Trustee's Seventh Cause of Action is dismissed.

As Debtors were insolvent from the end of February 2002/beginning March 2002 through February 2003, and Defendants Steven Tiffen and Sandra Cohen received Tax Dividends during that period, those payments were fraudulent conveyances, and are avoided, and Defendants are liable to the Debtors' estate, with interest thereon, as follows: (a) Defendant Steven Tiffen - $180,000.00; and (b) Defendant Sandra Cohen - $146,500.00.

2. Trustee's Fourth Cause of Action under the New York common law theory of unjust enrichment is denied as to the Salary Increases and the Saunders Loan Dividends, and is granted as to the Tax Dividends. The Tax Dividends issued to Defendants during the period of January 2001 through February 2003 are: (a) Steven Tiffen: $205,000.00; (b) Ira Tiffen: $169,760.58; (c) Sandra Cohen: $313,244.00; and (d) Barbara Mendelson: $31,100.00. Defendants are liable to the Debtors' estates in those sums with interest thereon.

3. Trustee's Sixth Cause of Action pursuant to 11 U.S.C. § 548(a)(1)(A) with respect to the Salary Increases and the Saunders Loan Dividends is denied, and as to the Tax Dividends it is granted. The Tax Dividends transfers made within one year of Debtors' filing (from February 2002 to February 2003) are avoided as fraudulent conveyances. Defendants Steven Tiffen and Sandra Cohen received Tax Dividends during this period. Trustee may recover the following damages against Defendants pursuant to 11 U.S.C. § 550(a) with interest thereon from the date of the transfers that Defendants received during this time period: (a) Defendant Steven Tiffen - $180,000.00; and (b) Defendant Sandra Cohen - $146,500.00.

4. Trustee's Seventh Cause of Action is denied.

The Court has found that the Debtors' estate is awarded damages relating to the Tax Dividends. As Trustee's causes of action overlap in their time frames, there is also an overlap in the damages awarded. Accordingly, in order to avoid duplication in damages with respect to the Tax Dividends, the Court finds that the following sums represent the maximum recovery, with interest thereon, that Trustee can recover for the Tax Dividends that Defendants received from Debtors from January 2001 through February 2003: (a) Steven Tiffen: $205,000.00; (b) Ira Tiffen: $169,760.58; (c) Sandra Cohen: $313,244.00; and (d) Barbara Mendelson: $31,100.00.



**Dated: Central Islip, New York**
**December 6, 2011**

**Dorothy Eisenberg**
**United States Bankruptcy Judge**